UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL J. FITZPATRICK,

Plaintiff,

v.

BRIAN FITZPATRICK, et al.,

Defendants.

No. 2:12-cv-2938 GEB AC (PS)

ORDER AND FINDINGS AND RECOMMENDATIONS

## I. BACKGROUND

This is a diversity action brought by Michael Fitzpatrick against his brother Brian Fitzpatrick and Brian's wife Diana Fitzpatrick. Plaintiff is proceeding pro se. Pending before the court is defendants' motion for summary judgment and plaintiff's cross-motion for summary judgment. ECF Nos. 99 (defendants), 104 (plaintiff). The motions were referred to the undersigned by Fed. R. Civ. P. 302(c)(21).

The undersigned has determined that these findings and recommendations may be issued without the need for a hearing. For the reasons set forth below, the undersigned will recommend that defendants' motion for summary judgment be granted, that plaintiff's cross-motion for summary judgment be denied, and that this action be dismissed with prejudice.

## II. PROCEDURAL HISTORY

After defendants successfully moved to dismiss plaintiff's fraud claim and one of his

breach of fiduciary duty claims, this matter proceeded on plaintiff's Second Amended Complaint ("Complaint"), ECF No. 48. The surviving claims are for (1) breach of an implied contract, (2) breach of fiduciary duty based on a fiduciary / partnership relationship, (3) breach of the implied covenant of good faith and fair dealing, (4) resulting trust, and (5) unjust enrichment. See ECF No. 59 (Order).

## III. LEGAL STANDARDS

### A. Summary Judgment

"A party is entitled to summary judgment if there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Young v. United Parcel Serv., Inc., 135 S. Ct. 1338, 1355 (2015) (quoting Fed. R. Civ. P. 56(a)). Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." Nursing Home Pension Fund, Local 144 v. Oracle Corporation (In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically store information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for

entry of summary judgment . . . is satisfied." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a "genuine" issue as to any "material" fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers," or material which it will be able to present in admissible form at trial, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c)(1); Maxwell v. County of San Diego, 708 F.3d 1075, 1079 n.1 (9th Cir. 2013). "The substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Nat'l Ass'n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)), cert. denied, 133 S. Ct. 1241 (2013). "An issue of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Pavoni v. Chrysler Grp., LLC, 789 F.3d 1095, 1098 (9th Cir. 2015) (quoting Anderson, 477 U.S. at 248).

"'[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Anderson, 477 U.S. at 288-89). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U .S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam). It is

the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . .. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87 (citations omitted).

B. The Claims

1. Implied Contract

"An implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civ. Code § 1621 (implied contract defined); Foley v. Interactive Data Corp., 47 Cal. 3d 654, 675 (1988) (implied-in-fact contract can be alleged through a "course of conduct, including various oral representations"). Thus, an implied contract differs from an express contract, which is manifested by words, whether written or oral. See McGough v. Univ. of San Francisco, 214 Cal. App. 3d 1577, 1584 (1st Dist. 1989) ("[a]n express contract is one whose terms are stated in words (either oral or written)") (citing Cal. Civ. Code § 1620 (express contract defined)). However, both forms have the same elements:

> The essential elements of a claim of breach of contract, whether express or implied, are [1] the contract, [2] the plaintiff's performance or excuse for nonperformance, [3] the defendant's breach, and [4] the resulting damages to the plaintiff.

Green Valley Landowners Ass'n v. City of Vallejo, 241 Cal. App. 4th 425, 433 (1st Dist. 2015).

2. Breach of the Implied Covenant of Good Faith and Fair Dealing

"'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' (Rest. 2d Contracts, § 205)." Foley, 47 Cal. 3d at 683. Thus, an element of this claim is the existence of a contract. Racine & Laramie, Ltd. v. Dep't of Parks & Recreation, 11 Cal. App. 4th 1026, 1031 (4th Dist. 1992) ("[t]he implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation") (citing Foley, 47 Cal. 3d at 683-684). Although breach of the implied covenant often is pleaded as a

separate count, a breach of the implied covenant is necessarily a breach of contract. Careau & Co. v. Security Pacific Business Credit, Inc., 222 Cal. App. 3d 1371, 1393-94 (2nd Dist. 1990).

3. Breach of Fiduciary Duty Based upon Partnership

Breach of fiduciary duty is established by: (1) the existence of a fiduciary duty; (2) a breach of the fiduciary duty; and (3) resulting damage. Pellegrini v. Weiss, 165 Cal. App. 4th 515, 524 (6th Dist. 2008). Plaintiff's surviving claim here alleges breach of this duty based on a fiduciary / partnership relationship. The sole damages plaintiff claims are deprivation of the value of his partnership or ownership interest in the Fitzpatrick Winery and Fitzpatrick Lodge. See Complaint (ECF No. 48) at 30.

4. Resulting Trust

A "resulting trust" arises "only where one has, in good faith, acquired title to property belonging to another." Bainbridge v. Stoner, 16 Cal. 2d 423, 428 (1940). "Under such circumstances, the law implies an obligation on the part of the one in whom title has vested to hold the property for the benefit of the owner, and, eventually to convey to the owner." Id. The only property that plaintiff alleges belongs or belonged to him is his alleged ownership interest in the Fitzgerald Winery and Fitzgerald Lodge.

5. Unjust Enrichment

> "The equitable remedy of restitution to avoid 'unjust enrichment' has its roots in the common law. '[O]ne person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly.' [Citation.]"

Dunkin v. Boskey, 82 Cal. App. 4th 171, 195 (1st Dist. 2000) (quoting Gardiner Solder Co. v. SupAlloy Corp., Inc., 232 Cal. App. 3d 1537, 1542 (2nd Dist. 1991)). The sole "unjust" conduct alleged by plaintiff is defendants' failure to pay him the value of his ownership interest in the Fitzpatrick Winery and Fitzpatrick Lodge.

IV. UNDISPUTED MATERIAL FACTS

1. In 1980 the Fitzpatrick brothers and Bill Bertram formed a partnership to

operate a winery that came to be known as FBF Winery. Defendants' Statement of Undisputed Facts (ECF No. 99-2) ("Facts") ¶ 1 (citing the June 15, 2015 Declaration of Brian Fitzpatrick ("B. Fitzpatrick Dec.") (ECF No. 99-3) ¶ 3). FBF winery was operated out of a property at 6881 Fairplay Road (the "6881 parcel"), which Brian Fitzpatrick had previously purchased. B. Fitzpatrick Dec. ¶¶ 2-3.

2. FBF Winery ceased to exist in 1984, when the Fitzpatrick brothers acquired Bill Bertram's interest in the winery. Facts ¶ 2 (citing B. Fitzpatrick Dec. ¶ 3).

3. The winery was re-christened Fitzpatrick Winery and was operated as a partnership consisting of the Fitzpatrick brothers until 1987. Facts ¶ 3 (citing B. Fitzpatrick Dec. ¶ 3).

4. In 1981 Brian Fitzpatrick located the forty acre parcel that is the focal point of this litigation. Fact ¶ 4 (citing B. Fitzpatrick Dec. ¶ 5).

5. Brian Fitzpatrick and plaintiff together purchased the property from Sue Hicks for $132,000, with plaintiff paying the $25,000 down payment, and the two of them executing a promissory note for the balance carried back by the seller, Sue Hicks, in the amount of $107,000. Facts ¶ 5 (citing B. Fitzpatrick Dec. ¶ 5).

6. The property purchased from Sue Hicks came to be known as the "Hill property." Facts ¶ 6 (citing B. Fitzpatrick Dec. ¶ 5).[1]

7. Title to the Hill property was taken in the Fitzpatrick brothers' names in May of 1981. Facts ¶ 7 (citing B. Fitzpatrick Dec. ¶ 5).

8. In November, 1981, Brian Fitzpatrick and plaintiff split the Hill property into two parcels, a 15 acre parcel that was deeded into plaintiff's name, and a 24.37 acre parcel that was deeded into Brian's name. Facts ¶ 8 (citing B. Fitzpatrick Dec. ¶ 5).

9. From 1981 to 1986, the brothers owned and operated the 6881 parcel the Hill property, and the winery. Facts ¶ 10 (citing B. Fitzpatrick Dec. ¶ 7).

---

[1] The parties also refer to this property as "the winery and Hill property" (see ECF No. 99-1 at 12:3-7, 13:24-27, ), and "the Fairplay property" (see ECF No. 99-1 at 12:16-19).

10. The winery was operated out of the 6881 parcel while the Hill property was developed. Facts ¶ 11 (citing B. Fitzpatrick Dec. ¶ 7).

11. After acquisition and through 1986, Brian Fitzpatrick had the Hill property cleared and he commenced installing infrastructure. Facts ¶ 12 (citing B. Fitzpatrick Dec. ¶ 7).

12. Also between acquisition and 1986, Brian Fitzpatrick commenced the process of developing a lodge and winery building on the Hill property. Facts ¶ 13 (citing B. Fitzpatrick Dec. ¶ 7).

13. Until 1986, plaintiff provided financing for the project, while Brian Fitzpatrick provided the labor. Facts ¶ 14 (citing B. Fitzpatrick Dec. ¶ 7).

14. The joint operation between the brothers came to a close in 1986. Facts ¶ 15 (citing B. Fitzpatrick Dec. ¶ 8).

15. As of 1986, plaintiff lacked the funds necessary to contribute to the development of the Hill property. Facts ¶ 16 (citing B. Fitzpatrick Dec. ¶ 8).

16. As of 1986, the construction of the lodge and winery had commenced at the Hill property, with the structure framed but roofless, with no funds to continue. Facts ¶ 17 (citing B. Fitzpatrick Dec. ¶ 8).

17. The brothers were not getting along and were unable to continue working together and engaged in unsuccessful discussions on how to disengage. Fact ¶ 18 (citing B. Fitzpatrick Dec. ¶ 8).

18. Brian sold the winery and Hill property in the fall of 2011. Facts ¶ 43 (citing B. Fitzpatrick Dec. ¶ 12).

The above undisputed facts were offered by defendants and, as best the court can tell, plaintiff does not dispute them. Plaintiff disagrees with the remaining facts offered by defendants, however. These are addressed as necessary below.

## V. ANALYSIS

Although plaintiff asserts five different causes of action, his claim for damages regarding all of them is the same, namely, he seeks the "full recovery [of] the value of his Ownership interests in both Fitzpatrick Winery and Fitzpatrick Lodge . . ." as of the date of its sale in 2011.

Complaint (ECF No. 48) at 30. Accordingly, based on the arguments and facts of this case, plaintiff's motion for summary judgment can be granted only if the undisputed facts show that at a minimum, plaintiff had an ownership interest at the time of the sale, and that he is not precluded from recovering because of "unclean hands."[2] Defendants will be entitled to summary judgment on the entire action if the undisputed facts show either that plaintiff had no such ownership interest, or that plaintiff is precluded from seeking relief under the doctrine of "unclean hands."

The undisputed facts here show that (1) by May 19, 1989 at the latest, and at all times thereafter, plaintiff had no ownership interest in the winery and lodge; and (2) in any event, plaintiff is precluded from seeking relief here by the doctrine of "unclean hands."

A. Plaintiff's Motion for Summary Judgment

Plaintiff, proceeding pro se, has filed a motion for summary judgment (entitled "Motion in Request of Summary Judgment") (ECF No. 104). In support of the motion and in opposition to defendants' motion for summary judgment, plaintiff submitted Exhibits A-K, L-R, Z and ASLA 1-8 (the "main exhibits").[3] See ECF No. 104 at 17-72. Plaintiff has also submitted additional exhibits in opposition to defendants' motion for summary judgment, specifically, Exhibits A, B, E, G-I, P & Q. See ECF No. 107 at 26-48. Finally, plaintiff has submitted additional exhibits in his Reply in support of his motion for summary judgment, specifically, Exhibits B, C, E-H. See ECF No. 112 ("Plaintiff's Reply") at 20-28. In addition, plaintiff has adopted the "undisputed facts" asserted by defendants, at ¶¶ 4-18, 19, 20 & 26. See ECF No. 107 at 26-48.

---

[2] Although plaintiff's complaint requests payment for his "ownership" interest, his litigation positions describe the actual nature of this alleged interest in several different ways. For example, sometimes plaintiff seems to be seeking repayment of a "loan." See M. Fitzpatrick Depo. at 46, lines 10-13 ("10 A I had a claim on the Hill property, I believe I was still on the bond of the winery, I had loans to the winery, both operating loans and loans secured by wine"). At other times, plaintiff describes his interest as being an investment that he has let "ride." See id. at 59 lines 18-19 ("I had already made an agreement that I was going to let my interest ride"). Most recently, plaintiff has revived an earlier description of this interest as "liabilities that are attached to lingering involvements with assets but not any value." See ECF No. 107 at 10 (citing prior testimony).

[3] The gaps in exhibit lettering result from non-sequential lettering or because exhibits were repeated.

1. Defendants' objections

Defendants have filed objections to the main exhibits on the grounds that "[p]laintiff has filed neither an affidavit or other appropriate admissible evidence in accordance with FRCP 56 . . .," that none of the exhibits has been "authenticated,"[4] and that each document is inadmissible on one or more of several grounds, specifically, hearsay, relevance and the best evidence rule. ECF No. 109 at 2-5.[5] Before ruling on the summary judgment motion, the court must "rule on evidentiary objections *that are material to its ruling*." Norse v. City of Santa Cruz, 629 F.3d 966, 973 (9th Cir. 2010) (en banc) (emphasis added), cert. denied, 132 S. Ct. 112 (2011).

Defendants' objections are well-taken.[6] While the rules governing admissibility do not apply with full force to motions for summary judgment (at least as to the party opposing summary judgment), plaintiff has failed to make any showing that the items he submitted could ever be presented in an admissible form at trial. See Fed. R. Civ. P. 56(c)(2); Norse, 629 F.3d at 973 ("[w]hile the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence"); Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."), cert. denied, 541 U.S. 937 (2004). Plaintiff

[4] A prerequisite for admissibility is "authentication," which means that the proponent has made a prima facie showing that an item of evidence is what its proponent says it is. See Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) ("[a]uthentication is a 'condition precedent to admissibility,' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims') (footnotes omitted) (quoting Fed. R. Evid. 901(a)). There are several ways of authenticating evidence. See Fed. R. Evid. 901(b) (examples of authentication). To authenticate the types of documents submitted by plaintiff, he would need to submit an affidavit or declaration from a person with knowledge of the document, attesting to what the document is. Orr, 285 F.3d at 773-74 ("[i]n a summary judgment motion, documents authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Fed. R. Civ. P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence'") (quoting Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987)).

[5] Plaintiff also did not comply with the court's Local Rules relating to scheduling the motion for a hearing, and providing a statement of undisputed facts. See E.D. Cal. R. 230(b) (noticing motions for hearing), 260(a) (requirement of "Statement of Undisputed Facts").

[6] However, the sole case authorities cited for these objections are Hoffman v. Applicators Sales And Serv., Inc., 439 F.3d 9 (1st Cir. 2006), and Palomba v. Barish, 626 F. Supp. 722 (E.D. Pa. 1985), neither of which is binding on this court.

has submitted mostly unauthenticated and seemingly random documents – signed and unsigned letters (some with dates, some without), pieces of paper with handwritten notes written on them, pieces of paper with financial calculations written on them, pages from unidentified deposition transcripts, a greeting card, checks, unidentified forms, signed and unsigned tax forms, and signed and unsigned deeds – with no indication of how these items could be introduced in admissible form at trial, and often with no indication of what they are, what they mean, who authored them or when, or what facts they are intended to prove.[7] Plaintiff's subsequent unsworn statement regarding the exhibits does nothing to warrant their consideration on a summary judgment motion. See ECF No. 113. That statement principally explains where plaintiff found each document, but in general it does not explain what the document is, who authored it, and why it could be relevant to this litigation.

However it is not necessary to formally rule on each of defendants' objections, since no such ruling who have any effect on the outcome of these motions. As discussed below, even if plaintiffs' exhibits were considered, they are insufficient to grant a summary judgment for plaintiff. Moreover, even where the documents (if authenticated) could support a material fact at issue here, defendants have placed each such fact in genuine dispute through evidence they have submitted.

2. Breach of Implied contract & implied covenant of good faith and fair dealing

Plaintiff's theory of his breach of contract claim seems to be that he agreed "under duress" to forbear from claiming any ownership interest in the Fitzpatrick Winery and Lodge, in exchange for defendant's promise to pay him "a portion of the value of the sale of the Fitzpatrick Winery and Lodge." See, e.g., ECF No. 104 at 2. However, plaintiff has not presented evidence of a contract – implied or otherwise – existing between himself and defendants under which defendants would pay plaintiff "a portion of the value of the sale of the Fitzpatrick Winery and Lodge." Nor has plaintiff presented evidence of conduct on the part of defendant from which

---

[7] Some of plaintiff's exhibits were authenticated during his deposition of May 5-6, 2015. For example, Exhibits C, D, F & G of plaintiff's Motion for Summary Judgment were authenticated as Exhibits 22, 23, 3 & 4, respectively, in plaintiff's deposition.

such a contract could be inferred.

Plaintiff cites Exhibit E to his motion (ECF No. 104 at 23-26), which, according to the portion plaintiff excerpted, appears to say that plaintiff would "cash in on the appreciation of this asset (lodge) when we . . . decide to sell lease or whatever." ECF No. 104 at 4. Even if plaintiff were able to authenticate this document as a letter to him from defendant, when read in context it contains no promise to pay plaintiff anything. The letter is a *proposal* to plaintiff. In the letter, defendant implores plaintiff to participate in the venture by "responding to govt. paperwork," and by presenting the author (presumably defendant), with "a plan that will complete the lodge and open for business by late spring 87." ECF No. 104 at 23. The letter goes on to state that *if* plaintiff were to do his part, then he would be able to "cash in" when the property sold. Id. at 23-24.

Plaintiff also argues that the partnership between himself and defendant was never properly "wound up," and that it was not to be wound up until the sale of winery and lodge, at which point plaintiff would be paid his share. ECF No. 104 at 4-7. If plaintiff is correct, the partnership could be the agreement under which plaintiff was to be paid his share of the winery and lodge. Plaintiff points to Exhibit H to his motion as evidence of his continued "silent partnership." See ECF No. 6 ("Defendant acknowledged Plaintiff's silent partnership position in private over the years"). However, even assuming this document could be authenticated and made admissible as evidence, it simply does not show that plaintiff was a partner – silent or otherwise – with defendant at the time of the 2011 sale. At best, the document – which according to plaintiff is a letter from his father to defendant in 1988 – could conceivably be evidence that plaintiff's father thought that plaintiff had a continuing interest in the partnership as of 1988.

That is not enough to grant plaintiff a summary judgment on the breach of contract claim. In any event, regardless of how this or any other of plaintiff's documents are interpreted, the best that can be said for plaintiff's position is that the matter of plaintiff's continued involvement in the partnership is genuinely in dispute, precluding summary judgment. First, defendant has submitted a sworn declaration in connection with these cross motions, stating that plaintiff was in the partnership "until 1987," and that "from 1987 forward," the partnership consisted of

defendant and his father only. Brian Decl. ¶¶ 3 & 10. Reading this declaration in the light most favorable to defendant – as the court must do on plaintiff's motion for summary judgment – it is evidence that plaintiff's interest in the partnership was terminated sometime in 1987.

Second, defendant has identified testimony by plaintiff in which plaintiff stated, under oath, that he had *no assets* (other than cash and personal belongings), as of May 19, 1989, the date of the testimony. See May 19, 1989 Sentencing Testimony of Michael Fitzpatrick ("M. Fitzpatrick Test.") (ECF No. 99-5 Exh. 8, ECF pp. 39-43) at 117:22 to 118:5 (transcript pagination). Since a partnership interest would qualify as an asset, plaintiff's own testimony shows that there is at least a genuine dispute about whether his interest in the partnership had already been extinguished by 1989.

Plaintiff offers no other basis for finding that there was a contract or agreement under which he was to be paid anything upon the sale of the winery and lodge. Accordingly, plaintiff's motion for summary judgment on the breach of contract claim should be denied. Since the claim for breach of the implied covenant of good faith and fair dealing is dependent upon the breach of implied contract claim, the motion for summary judgment on that claim should also be denied.

3. Breach of fiduciary duty based on a fiduciary / partnership relationship

Plaintiff's claim for fiduciary duty is based upon defendants' failure to pay plaintiff for his alleged partnership share upon the sale of the winery and lodge. See Complaint ¶ 13. As discussed above, however, plaintiff has not submitted evidence to show that the partnership agreement was in effect in 2011 when the winery and lodge were sold. Moreover, as discussed above, defendants have submitted evidence that plaintiff's interest in the partnership ended in 1987, decades before the 2011 sale. Plaintiff does not base this claim on any conduct other than the failure to pay him upon sale of the winery and lodge. Accordingly, plaintiff's motion for summary judgment on this claim should be denied.

4. Resulting trust

Plaintiff's "resulting trust" argument appears to be that the winery and lodge were held by defendant in trust for plaintiff. Specifically, plaintiff argues that he "has a substantial equitable claim on the assets of Fitzpatrick Winery and Lodge."

In support, plaintiff has submitted Exhibits K (ECF No. 104 at 34) and Z (ECF No. 104 at 54-59). According to plaintiff's brief, Exhibit Z is an excerpt of defendant's sworn deposition testimony. According to that excerpt, Exhibit K is a December 3, 1986 loan application to the Farm and Home Administration, prepared by defendant, in which defendant asserts that plaintiff had a "40% ownership of lodge / $128,000." Plaintiff cites Exhibit C to his summary judgment motion to show that although he "transferred" all of his assets out of his name, he did so only at the request of defendant and other family members, in order to "protect jointly owned assets." Further, he complied with their request "UNDER DURESS." ECF No 104. at 2-3 (emphasis in text). Plaintiff goes on to argue, citing Exhibit D, that the transfers to defendant and other family members were only an "illusion," and plaintiff actually retained title. See ECF No. 104 at 3. Taken together, these exhibits, if they could be made admissible at trial, do present evidence that plaintiff had an equitable stake in the lodge, and that he never actually relinquished that stake.

Plaintiff cannot be granted summary judgment, however, unless the evidence he presents is undisputed. Here, defendant has presented admissible evidence putting plaintiff's claim – that he retained this equitable claim – genuinely in dispute. Specifically, defendant identified testimony by plaintiff himself in which plaintiff stated, under oath, that he had *no assets* (other than cash and personal belongings), as of May 19, 1989, the date of the testimony. See May 19, 1989 Sentencing Testimony of Michael Fitzpatrick ("M. Fitzpatrick Test.") (ECF No. 99-5 Exh. 8, ECF pp. 39-43) at 117:22 to 118:5 (transcript pagination). Since a "substantial equitable claim on the assets of Fitzpatrick Winery and Lodge" would qualify as an asset, plaintiff's own testimony at a minimum shows that there is a genuine dispute about whether he had any interest in the winery and lodge at the time it was sold, there being no evidence that plaintiff ever acquired any other interest in the winery and lodge after 1989.

Therefore, even if plaintiff's exhibits could be made admissible and show that he had an equitable stake in the winery and lodge as of December 1986, it would still be at least genuinely disputed whether he retained this interest as of the 2011 sale. This dispute precludes the entry of summary judgment for plaintiff on this claim.

////

5. Unjust Enrichment

Plaintiff's claim for unjust enrichment seems to be based on his argument, discussed above, that he never relinquished his equitable interest in the winery and lodge, and therefore it is unjust for defendant to retain all the proceeds from its sale, that is, without paying plaintiff for the value of his equitable interest. As discussed above, however, there is at least a genuine dispute about whether plaintiff actually retained any interest in the winery and lodge as of the date of its 2011 sale. Accordingly, plaintiff should not be granted summary judgment on the claim that he was not justly compensated for his retained interest.

6. Unclean hands

Finally, even if plaintiff had presented a proper motion for summary judgment, he cannot recover on his lawsuit because he seeks to recover an ownership interest in the Fitzgerald Winery and Fitzgerald Lodge which he purchased, at least in part, with the proceeds of illegal commercial bribes and on which he illegally evaded paying taxes, as discussed more fully below. Plaintiff was convicted of taking bribes and of tax evasion regarding these proceeds, and his convictions were affirmed on appeal. See United States v. Fitzpatrick, 892 F.2d 162, 163-66 (1st Cir. 1989). Plaintiff's own testimony, and the findings of the U.S. Tax Court, establish that he used the proceeds of those illegal bribes, at least in part, to purchase his ownership interest. See Fitzpatrick v. C.I.R., 73 T.C.M (CCH) 2479 (U.S. Tax Ct. 1997) (tracing the unreported bribe money to the winery).

In addition, plaintiff asks this court to enforce an agreement he claims he had with his father and brother to conceal his ownership interest – from the federal judge who was considering plaintiff's sentence on the commercial bribery and tax evasion convictions, the prosecutor who was attempting to identify his assets during sentencing, and the Internal Revenue Service – until all those proceedings were completed.[8]

[8] Plaintiff repeatedly but inaccurately asserts that he was "cleared" of the tax evasion charges. See Plaintiff's Motion at 2 (plaintiff "was later cleared of the charges"); Plaintiff's Reply at 6 (plaintiff "was cleared of any tax liabilities"), 17 ("[p]laintiff was cleared of any tax liability which was the subject of his hasty conviction in 1991"); M. Fitzpatrick Depo. at 145:20-22 ("I was later cleared by the Internal Revenue Service of having done anything") , 232:2-3 ("the IRS . . . [continued]

Accordingly, plaintiff's motion for summary judgment should be denied.

B. Defendants' Motion for Summary Judgment

Plaintiff's lawsuit seeks only one remedy – damages in the amount of the value of his alleged interest in the Fitzpatrick Winery and Fitzpatrick Lodge (the "winery and lodge"). Defendants argue principally that plaintiff cannot show that he has any interest in the property, having sold his interest to his father in 1987. Defendants also argue that even if plaintiff somehow retained an interest in the property, his claim is defeated by the doctrine of "unclean hands."

The undersigned finds that defendants have met their burden to show that plaintiff had no ownership interest at the time of the sale, and that there is no triable dispute of fact on this point. In addition, the undisputed evidence shows that plaintiff's own conduct precludes him from maintaining this lawsuit, under the doctrine of "unclean hands."

1. Plaintiff had no interest in "the Hill property" at the time of the 2011 sale

a. The 1987 sale is not, without more, conclusive as to plaintiff's interest

The crux of plaintiff's case is that he maintained an ownership interest in the Fitzpatrick Winery and Fitzpatrick Lodge at the date of its sale in 2011. It is undisputed that the Fitzpatrick brothers bought the 40-acre Hill property on May 15, 1981 from Sue Hicks for $132,000. Facts

---

cleared me of any tax evasion charges"). It is true that after plaintiff was convicted of tax evasion, the IRS issued him a "no change" letter regarding the same tax years, 1981 and 1982, upon which his tax evasion conviction was based. See Fitzpatrick v. C.I.R., 70 T.C.M. (CCH) at ___, 1995 WL 68617170 at *2, 1995 Tax Ct. Memo LEXIS at *4-5. The "no change" letter stated that no change was needed in the reported taxes for those years. Id. Plaintiff sought to vacate his conviction under 28 U.S.C. § 2255 on the basis of this letter. See Fitzpatrick v. United States, 1:91-cv-00598 P JH (ECF No. 6) (D.R.I. January 9, 1992) (Pettine, J.). In the § 2255 proceeding, the IRS explained that the "no change" letter was merely an administrative device used to close the case after the IRS had determined that it would not be "economically feasible" for it to go after the money. Id. at 3. The IRS later "reopened" the tax examination for 1981 and 1982, and subsequently issued another notice of deficiency in 1994 for those same tax years, thus undoing its "no change" letter. Fitzpatrick v. C.I.R., 70 T.C.M. (CCH) at ___, 1995 WL 68617170 at *2, 1995 Tax Ct. Memo LEXIS at *4-5. The Tax Court upheld the IRS's deficiency notice, rejecting plaintiff's various arguments that it was estopped from doing so. Id., *passim*. In sum, plaintiff's tax evasion conviction was never overturned, and the IRS ultimately determined that he did have a deficiency for the applicable tax years after all. This notice of deficiency was upheld by the Tax Court, which found that plaintiff failed to report all his bribe income on his 1981 and 1982 tax returns. Fitzpatrick v. C.I.R., 73 T.C.M (CCH) 2479 (U.S. Tax Ct. 1997).

¶¶ 5-6. Plaintiff, whether personally or through entities he owned, provided financing for the winery and lodge until 1986. See, e.g., Facts ¶¶ 5-6 (plaintiff supplied the $25,000 down payment for the purchase of the Hill property), 14 (plaintiff provided financing for the project until 1986); M. Fitzpatrick Depo. at 47-48 (financing came through "Fefco," FBF Winery and "personal cash"). It is this financing that is the sole basis for plaintiff's claim of an ownership interest.

The parties dispute what happened to plaintiff's ownership interest after 1986. Defendants assert that plaintiff sold his entire ownership interest to his father, Joseph W. Fitzpatrick, in 1987. Facts ¶¶ 21-24. As payment, the father supposedly paid plaintiff $75,000, and assumed the existing loan against the Hill property. See Facts ¶ 24. As evidence, defendants submit evidence showing that plaintiff sold his interest in California Connection Corp. ("Cal-Con") – an entity owned by plaintiff – to his father.[9] However, defendants submit no evidence showing that plaintiff's *entire* ownership interest in the winery and Hill property was held by Cal-Con. To the contrary, plaintiff's testimony is that he invested in the winery not only through Cal-Con, but also directly, using "personal cash," as well as through other entities he owned. See M. Fitzpatrick Depo. at 47-48 (financing came through "Fefco," FBF Winery and "personal cash"). Thus, plaintiff's sale of Cal-Con to his father does not provide undisputed evidence that plaintiff sold his entire ownership interest in the winery to his father.[10]

---

[9] See May 6, 2015 Deposition Testimony of Michael Fitzpatrick ("M. Fitzpatrick Depo.") at 27:20 to 28:4, 53:15-17 (plaintiff owned Cal-Con). Defendants did not include this portion of the testimony in their exhibits. However, because defendants have submitted the entire deposition transcript as required by E.D. Cal. 133(j), it will be filed on the docket, and the court may now consider it to be a part of the record. See Fed. R. Civ. P. 56(c)(3) (court may considers matters in the record even if not cited by the parties).

[10] Defendants' other evidence consists of several documents authored by plaintiff which are so filled with jumbled and disjointed thoughts that their meaning is unclear. The references which defendants interpret to mean that plaintiff sold *all* of his ownership interest in the winery and lodge can only be read this way by drawing a great many inferences in defendants' favor, which the court cannot do on defendants' motion for summary judgment. For example, in one document, plaintiff refers to "the sale price of $75,000" but nowhere states that plaintiff was selling his ownership interest in the winery and lodge for that sum. See Roeca Dec. Exh. 14; see also Roeca Dec. Exh. 13 (referring to "the $75,000"). In other document, plaintiff refers to the "Hill/ASLA settlement in early 1987," without any indication of what that settlement involved, or its material terms. See id. Exh. 16. Elsewhere in the same exhibit, there is a great deal of verbiage referring to the "Cal-Con, Inc. Sale of the Fairplay Property," a "Purchase Price" . . . [continued]

Defendants claim that the father "confirmed under oath at plaintiff's sentencing hearing that he purchased all of plaintiff's ownership interest by purchasing it from plaintiff's corporation Cal-Con." Facts ¶ 33.[11] However, that is not what the cited testimony states. The most that can be made out of that testimony is that the father purchased *something* from plaintiff (the "Hicks property") for its "fair market value" of $75,000. See May 19, 1998 Sentencing Testimony of Joseph W. Fitzpatrick ("J. Fitzpatrick Test.") (ECF No. 99-5, Exh. 7 pp. 33-38), at 84:17 to 85:3, 89:15 to 90:5 (transcript pagination).[12] Nothing in the cited testimony indicates that the father bought all of plaintiff's ownership interest in the winery and lodge for this price.[13]

---

apparently involving the "Assumption of Hick's Note and $75,000," but nowhere is it specified that this is related to plaintiff's ownership interest in the winery or lodge. See id. Exh. 16; see also id. Exh. 17 ("Agreement of Parties" mentions "the purchase of the Fairplay Property from Cal-Con, Inc./Michael J. Fitzpatrick . . . for $75,000 and the assumption of the outstanding balance remaining on the Hick's note," but makes no mention of plaintiff's ownership interest in the winery or lodge). Defendants also seems to rely on other documents without explaining what point they support. See id. Exhs. 15 & 18. It is apparent from the fact that defendants relied on these documents for their motion – rather than producing any clear documentation of the alleged transactions – that the Fitzpatrick brothers were not particularly concerned with documenting their transactions in a way that could ever be understood by anyone other than those who already knew all the unstated assumptions and history upon which the documents seem to rest. Defendants do nothing to clear up the confusion created by these documents, instead seeming to rely upon the court's willingness to infer connections and meanings that are not apparent from the documents themselves.

[11] The father's testimony is admissible under the "former testimony" exception to the hearsay rule, as plaintiff was present when this testimony was given and had an opportunity to question his father about it. See Fed. R. Evid. 804(b)(1). Defendants submitted to the court a certified copy of the portion of the testimony they relied upon.

[12] On October 28, 1988, plaintiff deeded his interest in the property to Cal-Con. M. Fitzpatrick Depo. at 52:14 to 53:1, Exh. 5 at 6-7 (warranty deed from plaintiff and Mary Fitzpatrick to Cal-Con). On the same date, Cal-Con deeded its interest to plaintiff's parents. M. Fitzpatrick Depo. at 53:2-6, Exh. 5 at 8 (warranty deed from Cal-Con to parents). The transferring deeds state that they are "intended to replace that deed executed on January 20, 1987, by the same parties, but never filed." M. Fitzpatrick Depo. Exh. 5 at 6, 8. This language was added to the deed to fool the authorities who had indicted plaintiff for tax evasion; specifically, it was "to create evidence of intent to transfer property prior to my indictment." M. Fitzpatrick Depo. at 54:6-15.

[13] In any event, plaintiff testified that the transfer was not intended to actually transfer title to his father. He offers several different versions under oath. In one version, plaintiff transferred the property to Cal-Con and then to his parents in order to give his parents a "security interest" for the investments they had made in the winery. M. Fitzpatrick Depo. at 53:7 to 54:5. In another version, the transfer was to be an actual sale but the sale never happened because he never received any consideration. M. Fitzpatrick Depo. at 171:14-24 (the sale "was never consummated"). In another version, offered at his sentencing hearing, plaintiff indicates that it was an actual sale; that testimony was offered to explain how he had enough money to pay his lawyers. There he testified that he received $95,000 ($75,000 plus a note for $20,000) from the 1987 sale of 100 shares of Cal-Con to his parents. May 19, 1989 Sentencing Testimony of Michael Fitzpatrick ("M. Fitzpatrick Test.") (ECF No. 99-5 Exh. 8, ECF pp. 39-43) at 77-78 . . . [continued]

b. Plaintiff's 1989 testimony shows he had no ownership interest

Plaintiff was convicted of commercial bribery and tax evasion, and testified at his sentencing hearing on May 19, 1989. Declaration of Douglas R. Roeca ("Roeca Dec.") (ECF No. 99-5) ¶ 4 & Exh. 8. The following question and answer ensued:

> Q [prosecutor]: Mr. Fitzpatrick, my last few questions will relate to the subject matter of your property and assets. As you sit in the chair today, what are your assets?
>
> A [Michael Fitzpatrick]: I have reported I have probably $500.00 in cash, I have clothing, books, some sporting goods, skis, bicycle, that type of thing. But *beyond personal goods, I have no other ownership of – of assets of value*. I have a lot of liabilities that are attached to lingering involvements with assets but not any value.

May 19, 1989 Sentencing Testimony of Michael Fitzpatrick ("M. Fitzpatrick Test.") (ECF No. 99-5 Exh. 8, ECF pp. 39-43) at 117:22 to 118:5 (transcript pagination). Plaintiff acknowledges that this was his testimony.[14] Plaintiff's Reply (in support of his motion for summary judgment) ("Plaintiff's Reply") (ECF No. 112) at 5-6.

Therefore, whatever may have happened to plaintiff's ownership interest in the 1987 transaction with his father, plaintiff's own subsequent testimony makes clear that by May 19, 1989, he no longer had any ownership interest in the winery or the lodge, or anything else other than personal goods and some cash. Since plaintiff does not assert that he contributed anything to the property after May 19, 1989, and the evidence shows that he only contributed financing until 1986, defendants have met their burden to show that plaintiff will not be able to prove that he had any ownership interest at the time of the 2011 sale.

Plaintiff argues that defendants are simply misreading his 1989 testimony, and that actually, he was testifying that he *did* have assets, specifically, his ownership interest in the winery and lodge. Plaintiff's argument is based upon advice he says he got from unidentified "legal counsel":

---

(transcript pagination).

[14] Defendants submitted to the court a certified copy of the portion of the testimony they relied upon. Plaintiff's sworn testimony is admissible as a "prior statement," and is not hearsay. See Fed. R. Evid. 801(d)(1).

> Plaintiff consulted with legal counsel and was told that if he testified that he had lingering involvements of doubtful value he would not be perjuring himself. Plaintiff stated that to the best of his knowledge that as of the time of sentencing there was likely no value in the "lingering involvements with assets" which were illiquid and had claims of others against them. Plaintiff cannot see where the untruth is in this.

Plaintiff's Reply at 5. Plaintiff argues that it was the prosecutor's own fault that he failed to ask more questions to flesh out plaintiff's answer. Plaintiff's Reply at 5-6 ("Plaintiff asserts that he would have answered any questions regarding his "lingering involvements" to the best of his ability and understanding at the time. Plaintiff was simply not asked to do so.").

The undersigned rejects plaintiff's interpretation of his testimony because it is illogical, contradicted by his own deposition testimony, and purely self-serving. It may well be, as plaintiff seems to be arguing now, that he was attempting to deceive the prosecutor and judge at his sentencing hearing by appearing to say that he did not have any assets when in fact he was saying that he *did* have assets. However, the evidence before this court is plaintiff's admission under oath – however unhelpful it may be to him now – that he had no assets other than $500 and personal items, and that other than those things, he had only "a lot of liabilities."

Plaintiff's interpretation of his 1898 testimony is illogical and purely self-serving because it asks this court to accept that when plaintiff said "a lot of liabilities," he was actually referring to "assets" – namely, his ownership interest in the winery and lodge. Plaintiff's current interpretation of his answer is that his phrase "lingering involvements with assets," was a reference to his remaining ownership interest in the winery and lodge. However, that interpretation contradicts his recent deposition testimony that his 1989 testimony was *not* about Cal-Con (one of the ways in which he had invested in the winery) or the transaction involving the Hill property. M. Fitzpatrick Depo. at 147:3-20 (at the sentencing hearing, "I know I did not testify regarding any – Cal-Con or any transactions").

Plaintiff also seems to argue that his 1989 testimony was just a sham to fool the prosecutor and the sentencing judge. On this point, plaintiff argues:

> Plaintiff and Defendant and other family members agreed to participate in withdrawal of Plaintiff as owner of record of any assets.

> "The decision to dispose of all the other assets and your withdrawal of personal interest in everything **PENDING COMPLETION OF YOUR DIFFICULTIES**" (Exhibit C)
>
> Plaintiff was advised that he could testify that he had no ownership interests in that he had no dominion and control, assets were encumbered by debt and assets were illiquid and involved ownership by other "innocent parties". Plaintiff only made this statement during his sentencing hearing upon request by all interested parties, including the Defendant.

ECF No. 107 at 4-5 (emphasis in text). Plaintiff's *argument* – that he engaged in a deception, and possibly perjured himself, at the request of his family, and therefore the court should ignore his prior testimony – is not *evidence* that contradicts the testimony he gave at his sentencing.[15]

Accordingly, the undersigned finds it undisputed that by May 19, 1989 at the latest, plaintiff had no ownership interest in the Fitzpatrick Winery or the Fitzpatrick Lodge. Plaintiff has not raised a triable issue of fact on the matter. In light of plaintiff's 1989 testimony, no jury could conclude that plaintiff's assets at the time of his testimony included a stake in the winery or lodge.

2. "Unclean hands"

Even if plaintiff had retained an ownership interest in the winery and lodge, he cannot invoke the authority of this court to demand payment for it. As discussed below, plaintiff seeks to profit from an ownership interest that he acquired using the proceeds of illegal commercial bribes, and which he hid from the IRS and the sentencing judge in order to avoid having a lien placed on it.

Under California law, "[t]he doctrine of unclean hands bars a plaintiff from relief when the plaintiff has engaged in misconduct relating directly to the transaction concerning which suit

---

[15] Even if plaintiff had submitted a declaration or affidavit contradicting that prior testimony – which he has not done – the court would not simply accept it as evidence creating a genuine issue of fact for trial. Cf. Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony"). In any event, such a declaration would be, in this case, uncorroborated by any other evidence, and purely self-serving, and thus unlikely to create a genuine issue of fact worthy of resolution by a jury. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) ("this court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony") (quoting Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996)).

is brought." California Bank & Trust v. DelPonti, 232 Cal. App. 4th 162, 167 (4th Dist. 2014). "Although originally an equitable defense, it may apply to legal claims, as well." Id. The applicability of the defense "depends upon the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries." Blain v. Doctor's Co., 222 Cal. App. 3d 1048, 1060 (3rd Dist. 1990).

Here, there is no need to look to "analogous" case law, as the case law directly on point establishes that the defense is available in a claim for damages as well as claims for equitable relief. See Unilogic, Inc. v. Burroughs Corp., 10 Cal. App. 4th 612, 620 (1992) (citing Goldstein v. Lees, 46 Cal. App. 3d 614, 618 n.2 (1975)), petition for review denied, 1993 Cal. LEXIS 216 (1993). As for the nature of the misconduct, it is clear that bribery is sufficient to trigger the defense. See Unilogic, 10 Cal. App. 4th 612 at 621 (plaintiff's payment of a bribe, in addition to other bad conduct, "is enough to trigger application of the unclean hands doctrine"). Finally, the third factor is satisfied where, as here, plaintiff is attempting to profit directly from his illegal bribe-taking, that is, if "'[t]he misconduct . . . infect[s] the cause of action before the court.'" Unilogic, 10 Cal. App. 4th 612 at 621 (quoting Carman v. Athearn, 77 Cal. App. 2d 585, 598 (1947)).

a. Background

In 1981 and 1982, plaintiff was a loan officer at a bank in Rhode Island. Fitzpatrick v. C.I.R., 70 T.C.M. (CCH) 1357 (U.S. Tax Ct. 1995). While there, he took bribes in exchange for issuing or modifying loans on favorable terms. United States v. Fitzpatrick, 892 F.2d 162, 163-66 (1st Cir. 1989). He failed to report those bribes as income on his federal tax returns. Id. at 166 n.3. As described in more detail below, after sending the bribe proceeds through a Panamanian bank, plaintiff invested some of it in the winery. See generally, Fitzpatrick v. C.I.R., 73 T.C.M. (CCH) 2479 (U.S. Tax Ct. 1997).

In 1987, plaintiff was indicted in federal court for (1) "interstate travel in aid of bribery" in violation of the Travel Act, 18 U.S.C. § 1952, and conspiracy to violate the Travel Act, and (2) tax evasion in violation of 26 U.S.C. § 7201, and conspiracy to evade taxes. Fitzpatrick v. C.I.R., 70 T.C.M. (CCH) at ___, 1995 WL 686171 at *1, 1995 Tax Ct. Memo LEXIS 548

at *2-3. On May 19, 1989, plaintiff was convicted on the Travel Act, Travel Act conspiracy, and tax evasion charges, but was acquitted of the tax evasion conspiracy charge. Fitzpatrick v. C.I.R., 70 T.C.M. (CCH) at ___, 1995 WL 686171 at *1, 1995 Tax Ct. Memo LEXIS 548 at *2-3.

b. Fraudulent transfer of plaintiff's interest

As discussed above, plaintiff's own testimony establishes that he no longer had any interest in the winery and lodge by May 19, 1989. In his motion, plaintiff asserts that he had transferred his ownership interest in the property to his father, solely in order to hide it from the IRS, as plaintiff was at the time under indictment for tax evasion:

> The Plaintiff was REQUESTED by family members, including Brian Fitzpatrick, to transfer all assets from his name in order to avoid liens by the IRS while this matter was being resolved. The Plaintiff UNDER DURESS complied. (Exhibit C)

See Plaintiff's Motion at 2 (emphasis in text); see also, Plaintiff's Oppo. at 4.

This "argument" is fully supported by plaintiff's deposition testimony:

> Q: He was involved with the Hill property, and you're telling him that you need and he needs property regarding the valuation of the Hill property; right?
>
> A [plaintiff]: I think I was trying to – I was told that my father was going forward with the fiction that a sale had been done, even though I received no compensation, as a means to establish a conveyance to get it one step away from me. And I was worried that it would be judged to be a fraudulent conveyance, and because some of the money that the IRS was chasing ended up going into the Hill property, *we were trying to establish a means by which we wouldn't be caught flatfooted if the IRS collections team came in and tried to, you know, put a lien on the property.*

M. Fitzpatrick Depo. at 145:9-22 (emphasis added).

Plaintiff now sues to recover the value of that ownership interest. The problem is that plaintiff is arguing, in essence, that the transfer of his ownership interest was a fraudulent conveyance. According to his argument, and his own testimony, the transfer to his father was a sham that was embarked upon to avoid a federal government lien against the winery.[16] See State

---

[16] Plaintiff's fear appears to have been a reasonable one, since according to his own testimony he invested some of the bribe money in the winery. (It was also money that was the basis of the government's tax evasion indictment.) Plaintiff's deposition testimony also shows that the . . . [continued]

Bd. of Equalization v. Woo, 82 Cal. App. 4th 481, 484 (2000) ("[a]ppellant's attempt to transmute that interest to avoid Ho's tax debt constituted a fraudulent transfer in violation of . . . Civil Code section 3439.04, subdivision (a)"). This wrongful conduct was compounded when plaintiff testified under oath in 1989 that he had no assets, even though he believed at the time of his testimony that he retained an ownership interest in the winery and lodge. As a result of this conduct and false testimony, plaintiff comes into this lawsuit with unclean hands. See Nzmp (USA), Inc. v. Marconi (In re Global Health Sciences), 2008 WL 3851934, 2008 U.S. Dist. LEXIS 82642 (C.D. Cal. 2008) (unclean hands arising from fraudulent transfer).

Although plaintiff argues that defendant Brian Fitzpatrick also participated in this attempt to hide plaintiff's assets from the IRS, the only *evidence* before the court indicates that defendant had nothing to do with it.[17] See B. Fitzpatrick Decl. ¶¶ 9, 11 (Brian Fitzpatrick was told that his father purchased all of plaintiff's interest in "the Hill property," and had no further communications with plaintiff about "the winery or the property" after 1987, until this lawsuit was filed).[18]

c. Bribe money is used to acquire ownership interest

Plaintiff used some of the bribe money – approximately $28,930 (or $29,903) or more – to finance the winery and lodge. M. Fitzpatrick Depo. at 145:9 to 146:24:

> A [plaintiff]: I think I was trying to – I was told that my father was going forward with the fiction that a sale had been done, even though I received no compensation, as a means to establish a conveyance to get it one step away from me. And I was worried that it would be judged to be a fraudulent conveyance, and *because*

---

alleged fraudulent transfer was made to hide his assets from the prosecutor and the judge during his sentencing on the bribery and tax evasion counts.

[17] The court is not called upon to determine whether defendants knew that some portion of the winery and lodge was being funded by bribe money, nor whether defendants participated in the scheme to conceal assets. The only questions presented here are whether plaintiff is entitled to summary judgment, and whether defendants are entitled to have this action dismissed on their own summary judgment motion.

[18] This alleged fraudulent transfer appears to be the basis for plaintiff's claim that there was an implied contract to pay him when the winery and lodge were sold. However plaintiff offers no *evidence* that this implied contract – that plaintiff would fake a transfer of his ownership interest to his father, but that his brother would pay him its value upon the sale – ever existed. However, even if it did exist, it would be unenforceable here since its goal was to hide plaintiff's alleged ownership interest from the sentencing judge and the IRS.

> *some of the money that the IRS was chasing ended up going into the Hill property,* we were trying to establish a means by which we wouldn't be caught flatfooted if the IRS collections team came in and tried to, you know, put a lien on the property.
>
> Q: Are you saying that some of the money that you took as bribes went into the Hill property?
>
> A: I didn't take any money as bribes.
>
> Q: Whatever the – well, according to the appellate court you did. I mean –
>
> A: Well, they don't know all the facts, because all the facts weren't presented to them. And there were people who perjured themselves on the stand.
>
> *Q: Did some of the money that they contended in the criminal case were bribes make it – make its way into the Hill property?*
>
> *A: Yes.*
>
> *Q: How much?*
>
> *A: I'd have to look at all the records to separate it out. Between the winery and the Hill property, probably, I don't know, 143 – 80 to 100. But that's between the winery. For instance, that wine purchase of 28,930 came out of that.*

M. Fitzpatrick Depo. at 145:23 to 146:15 (emphases added).

Apart from plaintiff's admission, the Tax Court found that plaintiff used some of the bribe income – which he improperly failed to report on his 1981 and 1982 tax returns – to finance the winery. See Fitzpatrick v. C.I.R., 73 T.C.M. (CCH) 2479 (U.S. Tax Ct. 1997). In 1997, the Tax Court considered plaintiff's challenge to a 1994 IRS notice of deficiency based upon plaintiff's tax returns from 1981 and 1982. The Tax Court found that on December 18, 1981, plaintiff, a bank officer, was paid $200,000 – personally – to approve the modification of a bank loan agreement. Fitzpatrick v. C.I.R., 73 T.C.M. (CCH) 2479 at ___, 1997 WL 14393373 at *2, 1997 Tax Ct. Memo LEXIS 180 at *6. The checks "were deposited in a Panamanian bank, in the checking account of Rain & Shine (R&S), a Panamanian corporation." Id. These were some of the funds that plaintiff received in the bribery scheme for which he was convicted in 1989. See id., 1997 WL 14393373 at *4, 1997 Tax Ct. Memo LEXIS 180 at *13. From the R&S account, $143,075 was disbursed to "the Hill Winery Associates checking account." Id., 1997 WL

14393373 at *2, 1997 Tax Ct. Memo LEXIS 180 at *7-8. From that account, "$28,903" was disbursed to FBF Winery, a "Winery partnership with petitioner's brother in California." Id., 1997 WL 14393373 at *2, 1997 Tax Ct. Memo LEXIS 180 at *8.

Plaintiff's assertion that he never received any bribes is unavailing, since that matter was conclusively determined in his criminal trial. Moreover, the Tax Court conclusively determined that he used those funds to finance the winery's predecessor, FBF Winery. Plaintiff asserts no basis for his ownership stake other than his investment of money in the venture (he does not, for example, assert that he put "sweat equity" into the project). See Facts ¶¶ 14-16 (plaintiff's financing occurred prior to 1986); Plaintiff's Motion at 4 ("[u]ntil 1986, Plaintiff provided financing for the project"); Plaintiff's Reply at 4-5 ("JW Fitzpatrick and Defendant Brian Fitzpatrick exercised dominion and control of all of the Plaintiffs assets from late 1986 to present"). The court should not enforce plaintiff's desire to profit from his own illegal conduct.

## VI. CONCLUSION

The undersigned concludes that plaintiff has not presented evidenced from which a jury could conclude that he had any type of compensable interest in the winery or the lodge at the time of its 2011 sale. Accordingly, plaintiff cannot show that he was damaged by defendants' sale of the winery and lodge in 2011. In addition, whatever ownership interest plaintiff might have had was acquired, at least in part, with the proceeds of illegal commercial bribes. Accordingly, the doctrine of unclean hands defeats plaintiff's claims. There are no triable issues of fact material to either the ownership or unclean hands issues.

For the reasons stated above, IT IS HEREBY ORDERED that the Clerk of the Court shall enter the May 5, 2015 deposition transcript of Michael Fitzpatrick onto the docket.

For the reasons stated above, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (ECF No. 99), be GRANTED;
2. Plaintiff's motion for summary judgment (ECF No. 104), be DENIED;
3. This action be DISMISSED with prejudice; and
4. The Clerk of the Court be ordered to close this case.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Id.; see also Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections. Local Rule 304(d). Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: January 26, 2016

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE